Filed 9/10/25  P. v. Agboola CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL TEMITOPE AGBOOLA et al.,<br><br>    Defendants and Appellants. | B330883<br>(Los Angeles County<br>Super. Ct. No. BA482072) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen A. Marcus, Judge. Affirmed.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant Michael Temitope Agboola.

John Lanahan, under appointment by the Court of Appeal, for Defendant and Appellant Allen Asenuga.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants and appellants Michael Temitope Agboola and Allen Asenuga appeal from a judgment entered on a jury verdict finding them guilty of second degree murder and attempted robbery under Penal Code sections 187 and 211/664.[1] Defendants raise challenges regarding the sufficiency of the evidence, evidentiary issues, and defects in jury instructions. We conclude substantial evidence supports each of the challenged convictions, and there are no reversible errors. We affirm.

## FACTUAL BACKGROUND

**The events leading up to the crimes**

Agboola and Asenuga were interstate marijuana traffickers who purchased substantial quantities of marijuana in California and resold them in their home state of Texas. On September 20, 2019, Agboola reported to Los Angeles police he had been robbed of $32,000 in cash, his cellphone, and rental car keys. Agboola said he flew to Los Angeles with the money to purchase a Rolex watch. When he arrived for the purchase, he was robbed at gunpoint. Upset by the considerable loss, Agboola sought to recoup his money by making plans with Asenuga, Joseph Delane Matthews, and Ikouree McGregor to rob someone else.[2] Matthews and McGregor had a history of stealing from large-scale marijuana buyers by staking out marijuana "pop-up" stores[3] to

---

[1]  All undesignated statutory references are to the Penal Code.

[2]  Matthews and McGregor were also charged with counts 10 through 13, among other counts, but are not parties to this appeal.

[3]  "Pop-up" stores were transitory dispensaries, some of which operated illegally, that sold marijuana at a substantial discount.

target their victims, then following their victims home and robbing them of their purchase.

**The attempted robbery of unknown victim (count 13)**

The next evening, the four participants went to Cali Plug, a pop-up store that had set up its business for the day in a building at 1116 South Main Street in downtown Los Angeles. The participants arrived in two separate cars, with Matthews in a silver GMC SUV and the others in a rented BMW. Agboola was driving the BMW, with Asenuga sitting in front wearing a yellow shirt.[4] Matthews went inside the store and began taking photos of prospective victims, customers who appeared to be buying large amounts of marijuana. At 7:14 p.m., Matthews targeted a man with a backpack and kept in contact with McGregor regarding the target through text message exchanges. At 8:45 p.m., Matthews sent McGregor a text message the man with the backpack was leaving the store. The man with the backpack exited the parking lot in his car, making a left turn, northbound on Main Street. Agboola thereafter followed the man with the backpack. However, Agboola could not keep up with the target because "[h]e made a left too fast." The police were unable to ever identify the man who was targeted.

**The robbery of Jean Carlos De la Rosa and Nathaniel Davis and the murder of De la Rosa (counts 10-12)**

*De la Rosa and Davis targeted at Cali Plug*

At 9:23 p.m., Matthews returned to Cali Plug to seek another victim. Matthews observed Nathaniel Davis and Jean

---

[4] That day, the police stopped Agboola on Ninth Street and Figueroa Avenue while he was driving the BMW, with Asenuga in the front seat. Agboola had made an illegal U-turn on a one-way street leading to a DUI checkpoint.

Carlos De la Rosa, who spent about an hour making purchases in the store. Davis and De la Rosa were friends who traveled from Indianapolis to celebrate a mutual friend's birthday. With Davis's help, De la Rosa paid for their vacation, which included renting a large house in Tarzana, a Rolls Royce Wraith, and a Suburban SUV.

Davis and De la Rosa's purchases were placed in a large black trash bag and a box. Davis was not pleased with receiving their items in such conspicuous containers as he felt it made them targets. After Davis and De la Rosa completed their purchases and left the store, Matthews followed them to the parking lot. Davis and De la Rosa loaded their purchased products in the trunk of the rented Rolls Royce and headed back to the house in Tarzana. The crime participants in their two separate cars followed Davis and De la Rosa to the house.

### *The robbery and murder at the Tarzana house*

When Davis and De la Rosa arrived at the house in Tarzana, the sliding gate in the front was open. Davis got out to close the gate while De la Rosa stayed inside to park the car. As Davis attempted to close the gate, he felt a gun put to his head. The person holding the gun, Asenuga,[5] told Davis, "I need everything." Asenuga took Davis's wallet and phone and shot

---

[5] Davis testified the person holding the gun was wearing a yellow hoodie. Video surveillance outside Cali Plug showed the passenger in the BMW was wearing a yellow piece of clothing. Davis identified Asenuga from a photo as the yellow-hooded gunman who first approached him. Davis later identified Agboola as the gunman who first approached him. Nevertheless, the jury found true the allegations Asenuga personally discharged a firearm causing great bodily injury or death to De la Rosa.

twice to get Davis on the ground. Once Davis was on the ground, Asenuga kept saying, "Where's the dope? Pop the trunk." De la Rosa responded, "I don't know how to open the trunk. You guys just take the keys." After approximately 18 seconds, Davis heard two more shots while De la Rosa was still in the car. Davis heard the gunman say he shot De la Rosa, which he did not believe at first until he saw his friend hunched over calling 911 himself. A car then pulled up and at least two people got out and stepped over Davis.

After the gunman and the others left, Davis went to De la Rosa, helped him to the doorway of the house, and spoke with the 911 operator who was on De la Rosa's phone. De la Rosa's watch and a gold chain he wore had been taken, along with the marijuana in the trunk. De la Rosa was taken to the hospital, where he later died from a single gunshot wound to his torso.

Three expended .45-caliber casings from the same gun were found at the crime scene, two in the driveway and one in the Rolls Royce. The Rolls Royce's left door and rear quarter panel was damaged by a bullet shot into the door from the rear of the vehicle.

**Agboola's statements to an undercover agent in his jail cell**

On November 7, 2019, Agboola and Asenuga were arrested together in North Hollywood in a black Nissan Altima driven by Agboola. Afterwards, Agboola was placed in a jail cell with an undercover agent acting as a fellow inmate (*Perkins*[6] operation).

---

[6] *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*) (held *Miranda v. Arizona* (1966) 384 U.S. 436 warnings are not required when suspects are unaware they are speaking to a law enforcement officer and give a voluntary statement).

During the *Perkins* operation Agboola initially stated, "they don't have nothing on me," and added, "only thing they have me doing is . . . I helped them carry it into the hotel." Agboola acknowledged each defendant had a gun but insisted he had nothing to do with the incident.

Agboola was subsequently removed from his cell, questioned and sent back. When Agboola was back in the cell, he admitted being at the crime scene and identified the other participants. Agboola indicated Matthews told them where to go and whom to follow. However, Agboola said Matthews showed up after the robbery occurred. Agboola also stated Asenuga was the one who went with him during the incident, and they jumped out of the car first. Agboola denied shooting anyone but stated, "I was fighting. Fighting."

## PROCEDURAL BACKGROUND

Agboola and Asenuga were charged in a fourth amended information with murder (§ 187, subd. (a); count 10); robbery (§ 211; counts 11 & 12); and attempted robbery (§§ 211, 664; count 13); plus the allegations Asenuga personally used a firearm (§ 12022.53, subd. (b)), personally discharged a firearm (§ 12022.53, subd. (c)), and personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)).

At trial, in addition to evidence on the foregoing facts, the prosecution also presented testimony from FBI special agent Michael Easter, a member of the cellular analysis survey team. Easter testified to the location of Asenuga's cell phone among other phones, relying on phone records from T-Mobile. Easter indicated the cell phone data showed, on September 21, 2019, Asenuga was near the Hilton Los Angeles Airport from 3:56 p.m.

to 3:59 p.m., then he was southeast in the area of Hawthorne from 4:16 p.m. to 4:22 p.m. Easter testified, from 6:00 p.m. to 11:59 p.m., Asenuga was in the area of the dispensary. Easter stated the data showed Asenuga's phone was in the Los Angeles metropolitan area the night of September 22, 2019, then in San Antonio, Texas the following morning at approximately 5:03 a.m.

Easter also testified he was trained by cell phone carriers, including T-Mobile, as to the contents of a complete cell phone record. Easter indicated that when he received the phone records for Asenuga from the Los Angeles Police Department (LAPD), he reviewed them to confirm they were complete. When Easter was further asked about his opinion of the completeness and accuracy of the phone records, the defense objected to Easter providing testimony as to the accuracy of the records. The defense argued the phone records needed some external test to determine if they were accurate. The prosecution argued Easter had training from T-Mobile and could testify what the company does to ensure its towers are reporting accurately. While the objection was initially sustained, the court ultimately ruled Easter could opine the records appear to be accurate, but he in turn could be cross-examined as to the basis for the opinion.

Agboola and Asenuga were found guilty of second degree murder on count 10. Agboola and Asenuga were also found guilty of second degree robbery and attempted robbery on counts 11 through 13. In addition, the jury returned true findings on the firearm allegations against Asenuga, finding he personally discharged a firearm causing the death of De la Rosa.

Agboola was sentenced to a total prison term of three years eight months, plus 15 years to life (consecutive terms of 15 years to life on count 10; the midterm of three years on count 12; and

eight months [one-third the midterm of two years] on count 13). Asenuga was sentenced to a total prison term of 12 years eight months, plus 40 years to life (consecutive terms of 15 years to life, plus 25 years to life pursuant to section 12022.53, subdivision (d), for a total of 40 years to life on count 10; 12 years on count 12 [low term of two years, plus 10 years pursuant to section 12022.53, subdivision (b)]; and eight months [one-third the midterm of two years] on count 13).[7]

The defendants timely appealed.

## CONTENTIONS ON APPEAL

Agboola asserts five main arguments. First, he contends there is insufficient evidence supporting his conviction of attempted robbery (count 13). Second, he argues there is insufficient evidence supporting his conviction of second degree murder (count 10). Third, he asserts the trial court erred by using a jury instruction with the language, "act dangerous to human life," rather than "act involved a high degree of probability that it would result in death." Fourth, he maintains the court erred by failing to instruct the jury Agboola must know the actual killer's act, not the crime, was dangerous to life. Finally, he posits the court erred by admitting Agboola's second *Perkins* statements because he had already invoked his rights under *Miranda v. Arizona, supra*, 384 U.S. 436 (*Miranda*).

Asenuga asserts two main arguments. First, he argues there is insufficient evidence supporting his conviction of attempted robbery (count 13). Second, he maintains the trial

---

[7] The trial court imposed and stayed a term of three years pursuant to section 654 on count 11 for both Agboola and Asenuga.

court erred by admitting Easter's expert testimony on cellphone records because the records were inadmissible hearsay and violated his Sixth Amendment right to confrontation. Asenuga contends Easter could not attest to the records' accuracy because he had not prepared them.

## DISCUSSION

**I.** **Substantial evidence supports Agboola's and Asenuga's convictions of attempted robbery (count 13)**

### A. *Standard of review*

"In reviewing the sufficiency of the evidence to support a conviction, we determine "'whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged."'" (*People v. Misa* (2006) 140 Cal.App.4th 837, 842 (*Misa*).) "Under such standard, we review the facts adduced at trial in the light most favorable to the judgment, drawing all inferences in support of the judgment to determine whether there is substantial direct or circumstantial evidence the defendant committed the charged crime." (*Ibid.*) "The test is not whether the evidence proves guilt beyond a reasonable doubt, but whether substantial evidence, of credible and solid value, supports the jury's conclusions." (*Ibid.*)

"'We neither reweigh the evidence nor reevaluate the credibility of witnesses.'" (*In re Charles G.* (2017) 14 Cal.App.5th 945, 957.) "We resolve all conflicts in favor of the judgment and indulge all reasonable inferences from the evidence in support of the judgment." (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 321.) "Unless it is clearly shown that 'on no hypothesis whatever

9

is there sufficient substantial evidence to support the verdict,' the conviction will not be reversed." (*Misa, supra*, 140 Cal.App.4th at p. 842.) "'[R]eversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.'" (*In re Charles G., supra*, at p. 957.)

### B. *Substantial evidence shows Agboola's actions went beyond mere preparation*

Agboola contends the evidence is insufficient to support his conviction of attempted robbery of the unknown victim, because there was no act in furtherance of the robbery that went beyond preparation. Agboola argues his acts did not constitute attempt because he did not know and had not reached the location of the robbery. He also asserts there was nothing showing the participants would have put their plans into action once they could survey the scene and assess the risk. We disagree.

"In general, under California law, '[a]n attempt to commit a crime is itself a crime and [is] subject to punishment that bears some relation to the completed offense.'" (*People v. Toledo* (2001) 26 Cal.4th 221, 229.) "An attempt to commit a crime is comprised of 'two elements: a specific intent to commit the crime, and a direct but ineffectual act done toward its commission.' [Citations.] Other than forming the requisite criminal intent, a defendant need not commit an element of the underlying offense." (*People v. Medina* (2007) 41 Cal.4th 685, 694.)

"Robbery is defined as 'the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.' (§ 211.) An attempted robbery consists of two elements: (1) the specific intent to rob; and (2) a direct, unequivocal, but ineffectual, overt act towards the commission of

10

the intended robbery." (*People v. Burgess* (2023) 88 Cal.App.5th 592, 603–604.) "The jury may infer a defendant's specific intent to commit a crime from all of the facts and circumstances shown by the evidence." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

"For an attempt, the overt act must go beyond mere preparation and show that the killer is putting his or her plan into action; it need not be the last proximate or ultimate step toward commission of the crime or crimes [citation], nor need it satisfy any element of the crime [citation]." (*People v. Superior Court* (*Decker*) (2007) 41 Cal.4th 1, 8 (*Decker*).) However, "'[b]etween preparation for the attempt and the attempt itself, there is a wide difference. The preparation consists in devising or arranging the means or measures necessary for the commission of the offense; the attempt is the direct movement toward the commission after the preparations are made.' [Citations.] '"[I]t is sufficient if it is the first or some subsequent act directed towards that end after the preparations are made."'" (*Ibid.*)

"Although a definitive test has proved elusive, we have long recognized that '[w]henever the design of a person to commit crime is clearly shown, slight acts in furtherance of the design will constitute an attempt.'" (*Decker*, *supra*, 41 Cal.4th at p. 8.) "In the face of such manifest intent, 'an act done toward the commission of the crime may be sufficient for an attempt even though that same act would be insufficient if the intent is not as clearly shown.'" (*People v. Weddington* (2016) 246 Cal.App.4th 468, 478 (*Weddington*).) "Indeed, 'the plainer the intent to commit the offense, the more likely that steps in the early stages of the commission of the crime will satisfy the overt act requirement.'" (*Ibid.*) Further, "where . . . the crime involves concerted action— and hence a greater likelihood that the criminal objective will be

11

accomplished [citation]—there is a *greater* urgency for intervention by the state at an *earlier* stage in the course of that conduct." (*Decker, supra*, 41 Cal.4th at pp. 10–11.) "Whether acts done in contemplation of the commission of a crime are merely preparatory or whether they are instead sufficiently close to the consummation of the crime is a question of degree and depends upon the facts and circumstances of a particular case." (*Id.* at p. 14.)

We conclude substantial evidence supports Agboola's conviction of the attempted robbery of the unknown victim. There is no dispute he had the specific intent to rob the victim. In fact, this attempted robbery occurred only a few hours before the completed robbery of De la Rosa and Davis. There is evidence Matthews targeted prospective victims—here, a man with a backpack—inside the marijuana store by taking and sending pictures of them to the other crime participants. Not only is this evidence of Agboola's intent to rob the unknown victim of his marijuana, but it also shows the group's preparations for the commission of the offense. Agboola prepared for the robbery by planning and coordinating with Matthews and the other participants to identify the right candidate to rob, communicate when the victim was leaving the store, and track the victim's movement outside the store. Thus, the "design of a person to commit crime" was clearly shown at trial. (See *Decker, supra*, 41 Cal.4th at p. 8.) Agboola did not merely go to the marijuana store with fleeting thoughts of robbing someone of his or her purchase. Agboola engaged in a coordinated effort to target a vulnerable victim who would maximize the amount of marijuana they could take.

After preparations for the robbery were made, the evidence demonstrates Agboola put the plan into action by following the unknown victim in his car as he exited the parking lot, making a left turn on Main Street. This is a direct, unequivocal, overt act in furtherance of the commission of the intended robbery. Agboola's vehicle followed the victims in close proximity. While this was only the first or early overt action in furtherance of the intended robbery, even slight acts directed toward that end after preparations are made are sufficient for one to be guilty of an attempt to commit a crime. (See *Decker, supra*, 41 Cal.4th at p. 8.) Agboola only failed to rob the unknown victim because Agboola could not keep up with him as he made a left turn. And as discussed in *Decker*, when the crime involves concerted action, there is a greater urgency for the state to intervene at an earlier stage of the conduct. (*Id*. at pp. 10–11.) Here, Agboola acted in concert with the other participants to target the victim and track his movements, which allowed Agboola to closely follow the victim's vehicle.

Agboola cites *People v. Garton* (2018) 4 Cal.5th 485 (*Garton*), arguing his actions never crossed from preparation to attempt because he never arrived at the location where the contemplated crime would take place. Agboola asserts the participants could not know if their plan was even feasible as they did not know the victim's name, where he lived, and what his security arrangements were. Agboola's reliance on *Garton* is misplaced.

We initially note, "[w]hen we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts." (*People v. Thomas* (1992) 2 Cal.4th 489, 516.) Here, Agboola maintains his

13

actions, as compared with other cases, were not of the degree and scope to cross from preparation to attempt. We need not compare this case's facts with those of other cases, since they each have their own evidence, circumstances, and contexts. As discussed above, the evidence here shows Agboola followed the victim's vehicle in close proximity after targeting him in the marijuana store for robbery. This is substantial evidence Agboola made a direct, overt act in furtherance of the intended robbery, especially in light of the fact that Agboola's plan to commit the crime was clearly shown in his coordinated efforts to target the unknown victim to rob him of his marijuana.

Regardless, the comparisons Agboola makes of this case to others are inapposite. In *Garton*, the defendant planned to murder someone in Portland, Oregon. (*Garton, supra*, 4 Cal.5th at pp. 508–509.) The issue there was whether the defendant's conspiratorial acts done within California sufficiently amounted to attempts to commit the crimes in question. (*Id*. at pp. 507–508, 510.) Our Supreme Court ultimately found "[the defendant's] actions in California did not occur in close proximity to the victim or to the anticipated site of the murder in the Portland area." (*Id*. at p. 512.) The *Garton* court noted, while in California, the defendant could not enter the murder scene, hide in a position to give him a clear shot, or even go to the general vicinity of the planned murder scene. (*Ibid*.) *Garton* is distinguishable here because the defendant in that case was nowhere near the intended victim and could not put his plan into action in California. Here, Agboola's vehicle followed and was in close proximity with the victim's vehicle. Indeed, Agboola had put his plan into action by following the unknown victim out the parking lot after he had been targeted in the marijuana store for robbery.

14

The only reason Agboola's plan failed was because he could not keep up with the victim after he made a left turn. This case is nothing like *Garton*, where the acts at issue did not even occur in the same state where the intended victim was located.

Agboola also compares this case to *People v. Hajek and Vo* (2014) 58 Cal.4th 1144 (*Hajek*).[8] In *Hajek*, the defendants entered into the victims' residence, took some of them hostage, and murdered one of them. (*Id.* at pp. 1173–1174.) Agboola asserts this case shows a defendant must arrive at the victim's residence to commit the crime because *Garton* noted the *Hajek* decision "impl[ied] that the point of attempt had not yet been reached when defendants began driving to the residence, even though they had weapons and planned to murder the family." (*Garton, supra*, 4 Cal.5th at p. 514.) However, *Garton* cited *Hajek* to support the conclusion that a defendant with a clearly shown intent is not guilty of an attempt crime merely because the defendant made preparations or started moving towards the intended victim. (*Ibid.*) The circumstances here are distinguishable because Agboola followed the victim in close proximity before he failed to keep up. Such actions in furtherance of the crime are more than mere initial, general movements in the victim's direction.

We note the *Hajek* court held the defendants in that case committed the necessary "slight acts" toward the commission of the crime, rejecting the defendants' challenge to their attempted murder conviction based on insufficient evidence. (*Hajek, supra*, 58 Cal.4th at p. 1194.) The *Hajek* court did not expressly hold

---

[8]     Abrogated on other grounds by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.

15

none of the defendants' acts before entering the residence could be construed as overt actions toward the commission of the intended crime. (*Ibid*.) The *Hajek* court only stated, at the point the defendants entered the victims' residence, "it [could] fairly be said they were ""actually putting [their murderous] plan into action.""" (*Ibid*.) Regardless, the situation here is distinguishable because defendants were already following the victim's vehicle in close proximity and could have completed the robbery before arriving at any particular physical location.

In addition, Agboola cites *People v. Anderson* (1934) 1 Cal.2d 687 (*Anderson*) as a point of comparison. In *Anderson*, the defendant approached the ticket office of a theater and drew a gun to rob the clerk. (*Id*. at pp. 688–689.) The defendant fled the scene after discharging the gun and killing the victim. (*Id*. at p. 689.) The defendant was found guilty of committing murder while attempting robbery. (*Ibid*.) In dicta, the *Anderson* court observed, the "[d]efendant's conduct in concealing the gun on his person and going to the general vicinity of the Curran theater with intent to commit robbery may, for present purposes, be classified as mere acts of preparation . . . ." (*Id*. at p. 690.) The court concluded the defendant's conduct passed the preparatory stage when he entered the theater and pulled his gun about two feet from the ticket window with the intent to commit robbery. (*Ibid*.)

Agboola's reliance on the analysis in *Anderson* is misguided because the circumstances and evidence in that case are not comparable to those here. Agboola did not merely go to the "general vicinity" of the victim's location because the victim here was a moving target. Agboola made a direct, overt act by tracking and following the victim in close proximity in furtherance of the

16

commission of the intended robbery, which was prepared earlier through coordinated efforts to target the unknown victim. Agboola's attempted robbery only failed because he could not keep up with the victim's vehicle. Agboola's acts were beyond general movements around the area where the victim was situated.

Moreover, relying on *Weddington, supra*, 246 Cal.App.4th 468, Agboola similarly argues he had to "see" exactly where the intended crime would take place for his actions to cross from preparation to attempt. But *Weddington* does not specifically hold a defendant must "see" the place where the intended crime will ultimately occur to be guilty of an attempt to commit crime. In *Weddington*, the defendants traveled from the southern part of Los Angeles to the San Fernando Valley with tools in their car to commit certain burglaries. (*Id*. at p. 480.) The defendants drove slowly through their targeted neighborhoods, parked in front of and knocked on the doors of certain residences for several minutes, and peered over gates into backyards. (*Ibid*.)

The *Weddington* court observed the defendants' conduct was not the behavior of an innocent visitor. (*Weddington, supra*, 246 Cal.App.4th at p. 480.) The court held a "jury could thus reasonably conclude that appellants' acts constituted direct movements toward the commission of burglary after the preparations had been made, representing implementation of the plan and the commencement of the consummation of the crime." (*Ibid*.) The court noted, "even though appellants apparently decided not to complete the burglaries of some of the homes they targeted, the evidence supported the jury's conclusion that appellants had already taken steps to implement their plan. At this point, a voluntary withdrawal—even one occasioned by a

change of heart (of which there is no evidence here)—would constitute no defense to the charge of attempted burglary."

Similarly, Agboola's conduct was not the behavior of an innocent patron of the marijuana store. Agboola coordinated with the other participants to target the victim, which included receiving pictures of the intended victim and tracking his movement. Agboola made direct movements toward the commission of the intended robbery when Agboola closely followed the victim as he left the store and drove out of the parking lot. Indeed, unlike in *Weddington* where the defendants voluntarily withdrew from burglarizing some of the homes they targeted, Agboola only failed to complete the robbery because he could not keep up with the victim's vehicle. (*Weddington, supra*, 246 Cal.App.4th at p. 480.)

## C. *Substantial evidence shows Asenuga's actions went beyond mere preparation*

Asenuga asserts the evidence is insufficient to support his conviction of attempted robbery of the unknown victim because Asenuga was only a passenger and did not act to follow the victim's car in furtherance of the intended robbery. Asenuga maintains there is no evidence he shared Agboola's efforts to determine if the target was suitable to rob. We disagree.

As discussed earlier, this attempted robbery occurred only a few hours before the completed robbery of De la Rosa and Davis, in which Asenuga actively participated. Asenuga went to the marijuana store with Agboola and the other participants and was privy to the same information and communications from Matthews that allowed the participants to coordinate to target their robbery victim. It can reasonably be inferred from the evidence that Asenuga shared the same intent to rob the

18

unknown victim and joined in the efforts to track and follow him. Asenuga's conduct was not the behavior of an innocent passenger in a car seeking to patronize a marijuana store.

In addition to *Garton* and *Anderson*, which have been discussed above, Asenuga cites *People v. Johnson* (2013) 57 Cal.4th 250 (*Johnson*) to argue his actions were conflated with those of a coconspirator because he was punished for what was, at most, an agreement to case the marijuana store and its parking lot. Asenuga maintains his actions did not go beyond preparation and planning. Our Supreme Court in *Johnson* noted: "Conspiracy law attaches culpability at an earlier point along the continuum than attempt. 'Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act.' [Citations.] Conspiracy separately punishes not the completed crime, or even its attempt. The crime of conspiracy punishes the agreement itself and 'does not require the commission of the substantive offense that is the object of the conspiracy.'" (*Id.* at p. 258.)

The evidence does not show Asenuga merely agreed with the other defendants to scout the marijuana store and its surrounding area. As discussed above, Asenuga went to the store with the other defendants and was privy to the communications with Matthews to coordinate to target the robbery victim. After being privy to the communications, Asenuga did not simply abandon the plan and leave the scene. Instead, he remained in the car and joined in the efforts to track and follow the victim, which only failed because the victim's vehicle got away. The fact that Asenuga was a passenger and not the driver does not show he was an innocent bystander during this incident. Accordingly,

19

we conclude substantial evidence supports Asenuga's conviction of the attempted robbery of the unknown victim.

## II. Substantial evidence supports Agboola's conviction of murder (count 10)

Agboola contends there is insufficient evidence supporting his conviction of second degree murder of De la Rosa. Agboola asserts none of the four possible theories of liability—implied malice murder, aiding and abetting intentional murder, aiding and abetting implied malice murder, and actual killer—were proven at trial. Agboola maintains, even assuming arguendo any of the theories were proven, the conviction still must be overturned because the jury relied on an implied malice theory disavowed by the prosecution.

"Murder is the unlawful killing of a human being with express or implied malice aforethought." (*People v. Murphy* (2022) 80 Cal.App.5th 713, 725 (*Murphy*).) "Malice is 'express' when a person manifested a deliberate intention to unlawfully take away the life of another human being; it is implied when there was no considerable provocation or when the circumstances attending the killing show an abandoned and malignant heart." (*Ibid.*) In reviewing the sufficiency of the evidence for a second degree murder conviction we likewise "presume the existence of every fact the jury reasonably could have deduced from the evidence in support of the judgment." (*Ibid.*) Further, "[w]e discard evidence that does not support the judgment as having been rejected by the trier of fact for lack of sufficient verity." (*Ibid.*) "And if the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Ibid.*)

"Consequently, '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict.'" (*Ibid*.)

### A. *Substantial evidence shows Agboola aided and abetted implied malice murder*

We conclude substantial evidence supports Agboola's conviction of second degree murder because the evidence shows Agboola aided and abetted the implied malice murder of De la Rosa. "To support a finding of implied malice, the evidence must establish the defendant deliberately committed an act, the natural consequences of which were dangerous to life, with knowledge of the act's danger to life and a conscious disregard of that danger." (*Murphy, supra*, 80 Cal.App.5th at p. 726.) "That is, 'malice may be implied when [the] defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life.'" (*Ibid*.) "''To be considered the proximate cause of the victim's death, the defendant's act must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical.''" (*People v. Reyes* (2023) 14 Cal.5th 981, 988 (*Reyes*).)

"Implied malice is determined by examining the defendant's subjective mental state to see if he or she actually appreciated the risk of his or her actions." (*People v. Superior Court* (*Costa*) (2010) 183 Cal.App.4th 690, 697.) "'Phrased in everyday language, the state of mind of a person who acts with conscious disregard for life is, "I know my conduct is dangerous to others, but I don't care if someone is hurt or killed." The state of mind of the person who acts with conscious indifference to the

21

consequences is simply, "I don't care what happens.'" [Citation.] The standard for implied malice is subjective and requires the defendant appreciate the risk involved." (*Murphy, supra*, 80 Cal.App.5th at p. 726.) "Malice may be found even if the act results in a death that is accidental. [Citation.] It is unnecessary that implied malice be proven by an admission or other direct evidence of the defendant's mental state; like all other elements of a crime, implied malice may be proven by circumstantial evidence." (*Costa, supra*, at p. 697.)

"Aiding and abetting may be shown by circumstantial evidence. It is well settled that the presence at the scene of the crime and failure to prevent it, companionship and conduct before and after the offense, including flight, are relevant to determining whether a defendant aided and abetted in the commission of the crime." (*People v. Glukhoy* (2022) 77 Cal.App.5th 576, 599.) "[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea." (*People v. Powell* (2021) 63 Cal.App.5th 689, 712–713 (*Powell*).) "In the context of implied malice, the actus reus required of the perpetrator is the commission of a life endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act." (*Id.* at p. 713, fn. omitted.) "The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act,

knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life." (*Ibid.*)

Thus, "a direct aider and abettor of the killing who knew that his (or her) conduct endangered the life of another and acted with conscious disregard for life, may be guilty of second degree murder." (*People v. Langi* (2022) 73 Cal.App.5th 972, 979.) "[T]he essence of aiding and abetting a murder under an implied malice theory is the accomplice's act of aiding, by words or conduct, the commission of a life-endangering act with knowledge of the danger to life that the act poses. [Citation.] Such an aider and abettor need not intend to aid a killing to be held criminally liable for the result of the perpetrator's act." (*People v. Vargas* (2022) 84 Cal.App.5th 943, 955 (*Vargas*).)

Here, Agboola aided the commission of the life endangering act, the shooting, by bringing a firearm to the rented house in Tarzana with the intent to rob Davis and De la Rosa. Agboola admitted being at the crime scene, identified the other defendants, and acknowledged each of them brought firearms. Agboola was therefore present with a firearm when Davis was held at gun point, had his belongings taken, and, while two shots were fired, was ordered to open the trunk of his car. Although Agboola denied shooting anyone during the incident, he revealed he "was fighting. Fighting." It can reasonably be inferred from the evidence that Agboola fought Davis and kept him occupied while Asenuga robbed and shot De la Rosa. Accordingly, substantial evidence demonstrates Agboola's conduct during the incident aided the life-endangering act of the shooting to rob the victims of their marijuana.

There is also substantial evidence Agboola knew Asenuga intended the shooting, aided Asenuga in the commission thereof,

23

and knew of and consciously disregarded the danger to life Agboola's own acts posed during the incident. As discussed earlier, Agboola brought a firearm to the robbery and knew the other defendants had firearms. Agboola was armed at the crime scene and accompanied Asenuga while Davis was robbed at gun point. Asenuga shot twice to get Davis to cooperate. Asenuga shot multiple times when De la Rosa could not meet his demands to open the car trunk, with approximately 18 seconds in between the second and third shots. Since Agboola armed himself in the robbery and saw Asenuga use his firearm to get the victims to cooperate, it can reasonably be inferred Agboola knew Asenuga intended to shoot at De la Rosa when he failed to comply with the demands. Agboola only needed an intent to aid the commission of the shooting, not the resulting death itself, to be liable for Asenuga's acts in killing De la Rosa. (*Vargas, supra*, 84 Cal.App.5th at p. 955; *Powell, supra*, 63 Cal.App.5th at p. 713.) Agboola aided the commission of the shooting by "fighting" the victims while armed with a gun. It can reasonably be inferred Agboola knew his conduct had a high probability of causing death but consciously disregarded this risk.

Agboola argues he could not have admitted to being at the crime scene with a gun because he denied it during the statements he made regarding each defendant being armed. Agboola asserts, while he made *Perkins* statements that he was "fighting," this must have only meant he was a participant in the overall robbery because Davis himself never testified he physically struggled with anyone. While Agboola focuses on aspects of the case favorable to his defense, under the substantial evidence standard "'[a]ll evidence most favorable to the respondents must be accepted as true and that which is

24

unfavorable discarded as not having sufficient verity to be accepted by the trier of fact."' (*People v. Ryan* (1999) 76 Cal.App.4th 1304, 1316.) "'"[W]hen 'a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact."'"' (*People v. Overstock.com, Inc.* (2017) 12 Cal.App.5th 1064, 1079.) "The test 'is simply whether there is substantial evidence in favor of the respondent. If this "substantial" evidence is present, no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld. As a general rule, therefore, we will look only at the evidence and reasonable inferences supporting the successful party, and disregard the contrary showing."' (*Ibid*.)

Thus, the issues Agboola raises fail to show the conviction should be overturned. Agboola merely provides his own interpretations and contentions regarding the evidence. But it can reasonably be inferred from Agboola's "fighting" statement that he was involved in a physical struggle with the victims. And while Agboola initially denied being at the crime scene, he eventually admitted he was there and armed with a gun. It can reasonably be concluded there was a high degree of probability that death would result from Agboola's physical struggle with the victims while armed with a firearm. As discussed above, it is not dispositive there is controverting evidence or other inferences that can be drawn therefrom.

In addition, Agboola maintains there is insufficient evidence he had the mens rea of implied malice because there is no evidence Agboola knew Asenuga intended to shoot at De la

Rosa. Agboola asserts he and Asenuga were only dealers in marijuana, not robbers, and Asenuga had no history of shootings known to him. Agboola contends the quickness of the events and De la Rosa's unexpected attempt to flee, rebut any inference Agboola was aware of and consciously disregarded the risk of death.

We disagree there is no evidence of Agboola's knowledge and intent as to the shooting. As discussed above, the evidence shows Agboola was present when Asenuga held Davis at gunpoint and used his firearm to get the victims to cooperate. It can reasonably be inferred Agboola was aware Asenuga would fire his gun at the victims if they did not meet his demands. Further, there was approximately 18 seconds in between Asenuga's second and third shots at De la Rosa. That is ample time for Agboola to form intent. During this time, De la Rosa responded, "I don't know how to open the trunk. You guys just take the keys." Since Agboola had previously seen Asenuga fire his gun to get the victims to cooperate, it can reasonably be inferred Agboola knew Asenuga would fire his gun again when De la Rosa did not open the trunk.

Hence, it is not dispositive Asenuga had no history of shooting known to Agboola. Once Asenuga held up Davis at gunpoint and fired his gun to get the victims to cooperate, it can be reasonably inferred Agboola was aware Asenuga was a willing user of his firearm and intended to shoot at the victims if they failed to comply with his demands. Though Agboola maintains he and Asenuga were only marijuana dealers, not robbers, that did not prevent them from arming themselves, scouting a marijuana store, and following Davis and De la Rosa home to rob them. With Agboola suffering significant loss due to having been robbed

earlier, the participants were in a sufficiently desperate enough situation to resort to armed robbery. Since Agboola saw Asenuga's willingness to use his firearm during the robbery to force the victims to cooperate, it can reasonably be inferred Agboola knew Asenuga intended to shoot at De la Rosa when he failed to comply with the demands to open the car trunk.

In short, substantial evidence shows Agboola aided and abetted the implied malice murder of De la Rosa and was thus properly convicted of second degree murder. Sufficient evidence demonstrates Agboola aided the commission of the life-endangering act by bringing a firearm to rob the victims and kept Davis occupied by "fighting" him while Asenuga robbed and shot at De la Rosa. There is also evidence sufficient to show Agboola knew Asenuga intended the shooting and consciously disregarded the danger to life his own acts posed. Agboola saw Asenuga use his firearm multiple times to get the victims to cooperate. There was also a sufficient time gap in between the second and third shots to De la Rosa for Agboola to form intent. Because there is sufficient evidence demonstrating Agboola is guilty under the theory of aiding and abetting implied malice murder, we need not delve into the other possible theories of liability Agboola raises.[9]

---

[9] We note Davis later identified Agboola as the gunman who first approached him. This may be evidence Agboola was the direct perpetrator notwithstanding any conflicting evidence because the substantial evidence standard requires "[w]e discard evidence that does not support the judgment as having been rejected by the trier of fact for lack of sufficient verity." (*Murphy, supra*, 80 Cal.App.5th at p. 725.)

**B.** *Agboola's reliance on* **People v. Emanuel** *is misplaced*

On June 2, 2025, our Supreme Court issued a decision in *People v. Emanuel* (2025) 17 Cal.5th 867, 896 (*Emanuel*), which reversed an order denying a petition for resentencing under section 1172.6. The *Emanuel* court concluded there was insufficient evidence of reckless indifference, finding the trial court improperly focused on the defendant's unsuccessful or inadequate efforts at restraint. (*Ibid.*) Agboola asserts *Emanuel* is instructive on several factors in this case.

Agboola's reliance on *Emanuel* is misplaced. Agboola relies on *Emanuel* to make arguments regarding implied malice murder, but *Emanuel* involved felony murder. (*Emanuel, supra,* 17 Cal.5th at pp. 874–875.) "An opinion is authority only on the point decided, and language that sweeps more broadly is *dictum*, with no binding force." (*People v. Meza* (2019) 38 Cal.App.5th 821, 827–828 (*Meza*), italics added.) "'"The holding of a decision is limited by the facts of the case being decided, notwithstanding the use of overly broad language by the court in stating the issue before it or its holding or in its reasoning."'" (*Id.* at p. 827.) Here, Agboola cites *People v. Pittman* (2023) 96 Cal.App.5th 400 to argue *Emanuel* is instructive because there is an equivalence between reckless indifference (felony murder) and conscious disregard (implied malice murder). But *Emanuel* applied the

*Clark*[10] and *Banks*[11] factors for evaluating the major participant and reckless indifference standards of felony murder, which were not discussed in *Pittman*. (*Emanuel*, *supra*, at pp. 883–885.) Indeed, it has not been established the *Clark* and *Banks* factors apply to implied malice murder. (See *People v. Gudiel* (2024) 107 Cal.App.5th 848, 860 ["Appellant contends the trial court should have applied [*Clark*] because 'reckless indifference to human life' under section 190.2, subdivision (d), is 'similar' to the conscious disregard for human life that is the critical element of second degree murder. We do not agree. [¶] These concepts have been separately and distinctly analyzed and applied in our jurisprudence for decades."].)

Regardless, *Emanuel* is distinguishable on the facts. Agboola contends *Emanuel* shows it is not probative Agboola did not render aid to the victims or try to minimize the risk of violence in this case. However, there is substantial evidence of Agboola's guilt other than his failure to render aid or attempt to minimize the risk of violence. Agboola brought a firearm to rob the victims and, while armed, fought Davis and kept him occupied as Asenuga robbed and shot at De la Rosa. Unlike *Emanuel*, Agboola's conviction does not need to be based on a failure to render aid or attempt to minimize the risk of violence

---

[10]  *People v. Clark* (2016) 63 Cal.4th 522, 618–623 (identified a list of considerations relevant to determining whether a defendant exhibited a "reckless indifference to human life").

[11]  *People v. Banks* (2015) 61 Cal.4th 788, 803 (identified a list of considerations relevant to determining whether a defendant's participation in a highly dangerous criminal activity was "major").

as the evidence is sufficient to show Agboola actively participated in aiding and abetting the implied malice murder.

In addition, Agboola asserts *Emanuel* is instructive here because it was found in that case the record did not "contain evidence that Emanuel knew [the actual killer] had a propensity for violence." (*Emanuel*, *supra*, 17 Cal.5th at p. 887.) Agboola maintains there was no indication Asenuga would turn violent because they were both nonviolent arbitrageurs, not robbers like codefendants Matthews and McGregor.

But in *Emanuel*, the defendant "did not use a gun or other weapon during the robbery. The only gun was used by [the actual killer, and] 'there was no evidence in the record demonstrating that, prior to the robbery, Emanuel knew [the actual killer] possessed a gun, would bring that gun to the robbery, or "was likely to use lethal force."'" (*Emanuel*, *supra*, 17 Cal.5th at p. 885.) In contrast, Agboola was armed, fought the victims while possessing a gun, and knew the other defendants each brought firearms to the robbery. Agboola was with Asenuga as he held up Davis at gunpoint and fired his gun to get the victims to cooperate. It can reasonably be concluded from this evidence Agboola had sufficient information to be aware of Asenuga's propensity for violence. And while Agboola maintains they were not robbers like Matthews and McGregor, they nevertheless willingly partnered with Matthews and McGregor knowing the codefendants' experience in robbery.

Finally, Agboola posits *Emanuel* provides guidance here because the violence unfolded quickly in seconds, which weighs against a finding of reckless indifference due to a failure to intervene. However, the *Emanuel* court stated: "We do not suggest that a rapidly unfolding crime may never allow for a

30

finding of reckless indifference to human life. But where a crime unfolds quickly, this factor—the failure to restrain a cohort—cannot be said to weigh in favor of a finding of reckless indifference without some evidence in the record indicating that the defendant had a meaningful opportunity to do so." (*Emanuel*, *supra*, 17 Cal.5th at p. 892.) As discussed above, Agboola was present when Asenuga held up Davis with a loaded gun before taking his wallet and phone. It can reasonably be inferred Agboola had a meaningful opportunity during this time to intervene when he saw Asenuga was a threat. Further, there was approximately 18 seconds in between Asenuga's second and third shots at De la Rosa. It can reasonably be concluded this was plenty of time for Agboola to try to stop Asenuga from firing further shots at the victim. Accordingly, *Emanuel* is distinguishable and not instructive for determining the outcome of this case.

### C. *The jury was instructed on aiding and abetting implied malice murder*

Agboola contends the theory of aiding and abetting implied malice murder is foreclosed because the jury was not so instructed. Agboola asserts the prosecutor failed to proffer any instructions on this theory and the court did not independently propose one. Agboola argues the prosecutor at trial disavowed the theory Asenuga himself acted with implied malice.

The record shows the jury was instructed on both aiding and abetting and implied malice murder. While there were separate instructions for these two matters, there is nothing showing this was reversible error. "The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the

jury applied the instruction in an impermissible manner.'" (*People v. Mitchell* (2019) 7 Cal.5th 561, 579 (*Mitchell*).) Thus, given jury instructions are read as a whole, the separate instructions were not an error per se as nothing shows it was reasonably likely this caused the jury to misapply the instructions. We note the instructions used at trial on aiding and abetting detailed the required knowledge, intent, and conduct, as well as other special considerations for applying the theory. The instructions used for implied malice murder detailed the requirements that there be an intentional act dangerous to human life, performed with knowledge of and conscious disregard for the danger. Thus, the record sufficiently demonstrates the jury received instructions on aiding and abetting implied malice murder.

As to Agboola's arguments regarding the prosecutor's disavowal of the theory of implied malice at trial, this is not a ground to overturn the conviction. "[T]heories suggested by the prosecutor are not the sole theories the jury may consider in making its determination of guilt." (*People v. Clark* (2011) 52 Cal.4th 856, 947.) "It is elementary . . . that the prosecutor's argument is not evidence and the theories suggested are not the exclusive theories that may be considered by the jury." (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.) Thus, although the prosecutor suggested there was express malice and not implied malice, this did not prohibit the jury from considering implied malice in making its determination of guilt.

## III. The trial court did not err in instructing the jury regarding aiding and abetting implied malice murder

### A. *Standard of review*

"We review defendant's claims of instructional error de novo." (*People v. Johnson* (2009) 180 Cal.App.4th 702, 707.) "'In conducting this review, we first ascertain the relevant law and then "determine the meaning of the instructions in this regard." [Citation.] [¶] The proper test for judging the adequacy of instructions is to decide whether the trial court "fully and fairly instructed on the applicable law . . . ."'" (*Ibid.*) "In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution." (*Mitchell, supra*, 7 Cal.5th at p. 579.) "'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.'" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1112.)

### B. *The court did not inadequately define the nature of the actus reus or err in not specifying Agboola must know the actual killer's "act," not the "crime," was dangerous to life*

Relying on *Reyes, supra*, 14 Cal.5th 981, Agboola posits the trial court erred by failing to specify in its jury instructions on aiding and abetting implied malice murder that Agboola must know the actual killer's "act," not "crime," was dangerous to life and had a high degree of probability of resulting in death. Agboola argues the instructions used were overbroad and swept in more conduct than the law allowed for the crime. Agboola

33

argues the authors of CALCRIM and the Judicial Council have since revised the standard jury instructions to include this language, acknowledging the prior instructions were erroneous.

We conclude Agboola's reliance on *Reyes* is misplaced because it is not a case involving instructional error. As discussed above, an opinion is authority only on the point decided and limited by the facts of the case. (*Meza, supra*, 38 Cal.App.5th at pp. 827–828.) *Reyes* involved an appeal from an evidentiary hearing under section 1170.95 (now § 1172.6). (*Reyes, supra*, 14 Cal.5th at pp. 984, 986–987.) Although the *Reyes* court noted the trial court improperly relied exclusively on the legal principles outlined in CALCRIM No. 520, the decision made no sweeping determination that the standard jury instructions used in this case, CALJIC No. 8.31, or any other instructions, are erroneous. (See *Reyes*, at pp. 984–992.) Even if CALCRIM No. 520 has since been revised, there is nothing on point establishing it was reversible error to use CALJIC No. 8.31 for the jury instructions in this case.

Further, the facts and circumstances in *Reyes* are distinguishable. It was explained there: "The trial court's factual findings illustrate the nature of its error. The court found that 'the defendant, along with several other gang members, one of which [was] armed, traveled to rival gang territory' and then considered whether that act was done with the mental state required for implied malice. [But] the trial court should have asked whether Reyes knew that Lopez intended to shoot at the victim, intended to aid him in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life." (*Reyes, supra*, 14 Cal.5th at pp. 991–992.) The *Reyes* court concluded the matter should be remanded because "given

the nature of this error, it is 'uncertain whether the trial court would have reached the same result using correct legal standards.'" (*Id*. at p. 992.)

The uncertainty described in *Reyes* does not similarly exist here because substantial evidence demonstrates Agboola knew Asenuga intended to shoot at the victim. As discussed earlier, Agboola was present when Asenuga held up Davis at gunpoint and fired his gun multiple times to get the victims to cooperate. Further, there was a sufficient time gap in between the second and third shots to De la Rosa for Agboola to form knowledge and intent. There was no evidence presented in *Reyes* showing the defendant saw his fellow gang member fire his gun multiple times before shooting the victim. (See *Reyes, supra*, 14 Cal.5th at pp. 985–986.) And unlike in *Reyes* where the defendants were allegedly creating a dangerous situation merely by bicycling into rival gang territory, Agboola and Asenuga were robbing two victims while armed with firearms.

We note the jury in this case did not necessarily rely on a theory of aiding and abetting implied malice murder. There is evidence Agboola himself was a shooter during the robbery, since Davis identified him as the gunman in the yellow sweatshirt who initially robbed him and shot twice to get the victims to cooperate. Moreover, unlike in *Reyes*, there is substantial evidence of proximate causation and Agboola's act involving a high degree of probability of resulting in death. Agboola was armed with a gun and "fighting" the victims, which can reasonably be concluded as involving a high degree of probability of resulting in death. In *Reyes*, the evidence was insufficient to show proximate causation because there was no reason to believe the killing would not have occurred if the defendant had not

35

accompanied his fellow gang members. (*Reyes, supra*, 14 Cal.5th at p. 989.) Whereas here, there is reason to believe the killing would not have occurred without Agboola's acts because he physically struggled with Davis and kept him occupied while Asenuga shot at De la Rosa.

## IV. The trial court did not err in admitting Agboola's second *Perkins* statements after he had already invoked his *Miranda* rights

Agboola asserts his second *Perkins* statements made after he was returned to his cell were erroneously admitted because he had already invoked his *Miranda* rights.[12] Agboola argues *Perkins* did not involve a defendant who had already invoked his *Miranda* rights when he spoke to the undercover agent. Agboola posits *Miranda* was intended to protect against the police using trickery to obtain a confession from a participants who had invoked his *Miranda* rights.[13]

This court decided this issue in *People v. Orozco* (2019) 32 Cal.App.5th 802 (*Orozco*). There, the defendant argued his repeated invocation of his *Miranda* right to counsel during his first interview precluded the trial court from admitting his confession obtained during a subsequently arranged meeting. (*Id.* at p. 812.) This court held that *Perkins* controlled for three reasons. (*Id.* at p. 813.) First, there is no "'interrogation'" when a suspect speaks with someone he does not know is a police's agent.

---

[12]    The People argue Agboola forfeited this issue because he failed to raise it during the underlying proceedings. But it appears Agboola raised this issue in his September 7, 2022, motion to exclude statements in violation of *Miranda*.

[13]    Our Supreme Court granted review on this issue on November 20, 2024, in *People v. Allen* (S286520).

(*Id.* at p. 814.) "Implicit in the definition of 'interrogation' is that (1) the suspect is talking to the police or an agent of the police, *and* (2) the suspect *is aware* that he is talking to the police or one of their agents. This is why a suspect can be subject to 'interrogation' when he knowingly interacts with the police or their agents." (*Id.* at p. 813.)

Second, this court addressed whether *Edwards v. Arizona* (1981) 451 U.S. 477 should control instead of *Perkins*. (*Orozco, supra*, 32 Cal.App.5th at p. 814.) *Edwards* "holds that a suspect's invocation of his *Miranda* right to counsel precludes 'further police-initiated custodial interrogation' unless and until counsel is present or the suspect 'initiates further communication' with the police." (*Orozco*, at p. 812.) This court concluded "the rationale underlying *Miranda* dictates that *Perkins*, not *Edwards*, should control." (*Id.* at p. 814.) This court noted *Miranda*'s rule was designed to dispel the "'compelling' 'psychological' 'pressures'" inherent in custodial interrogations, the same pressures upon which *Edwards*'s rule is based. (*Orozco*, at p. 814.) "*Edwards*'s rule is accordingly 'justified only in circumstances where th[ose] coercive pressures' exist. [Citation.] This makes sense: *Edwards* implements *Miranda*, so should be limited to the evil *Miranda* was created to combat." (*Ibid.*) "To apply *Edwards* here is to require police to provide counsel while a suspect is speaking with a lover, family member or friend in what he (mistakenly) thought was a private conversation. This would undoubtedly discourage suspects from speaking to anyone and thus effectively convert *Edwards* into a rule automatically excluding all postinvocation statements, a result that *Edwards* itself acknowledged swept far beyond *Miranda*'s reach." (*Id.* at pp. 814–815.)

37

Third, this court observed California courts have uniformly concluded *Perkins* controls when a suspect invokes his *Miranda* right to counsel but later speaks to someone he does not know is a police's agent. (*Orozco*, *supra*, 32 Cal.App.5th at p. 815; see *People v. Plyler* (1993) 18 Cal.App.4th 535; *People v. Guilmette* (1991) 1 Cal.App.4th 1534.)

Agboola urges this court to not be bound by its prior opinion and to revisit this issue. However, Agboola fails to show any change in circumstances since *Orozco* was decided. We find the discussion in *Orozco* therefore applies here and conclude *Perkins* controls. Thus the trial court did not err in admitting Agboola's second *Perkins* statements.

## V. The trial court did not err by admitting expert testimony regarding cell phone data

### A. *Standard of Review*

"'[A]n ap[p]ellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence.'" (*People v. Thomas* (2021) 64 Cal.App.5th 924, 970.) "This deferential standard of review applies to our review of the trial court's determination . . . whether proffered evidence constitutes inadmissible hearsay . . . ." (*Osborne v. Todd Farm Service* (2016) 247 Cal.App.4th 43, 50–51, citations omitted.) "The trial court's 'discretion is only abused where there is a clear showing [it] exceeded the bounds of reason, all of the circumstances being considered.'" (*People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 640.) However, "[t]he California Supreme Court has held that appellate courts should generally apply the de novo or independent standard of review to claims that implicate a defendant's constitutional right to

confrontation." (*People v. Sweeney* (2009) 175 Cal.App.4th 210, 221.)

**B.** ***Asenuga forfeited his objections to Easter's testimony based on hearsay and the confrontation clause***

The People contend Asenuga forfeited his objections to Easter's testimony based on hearsay and the confrontation clause because he failed to assert them at trial. Here, Asenuga admits there was no hearsay objection. Further, Asenuga does not indicate he objected based on the confrontation clause. Instead, Asenuga asserts his objection based on the accuracy of the phone records implicates his Sixth Amendment right to confrontation.

However, "the general rule [is] that trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal." (*People v. Dykes* (2009) 46 Cal.4th 731, 756.) "What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." (*People v. Partida* (2005) 37 Cal.4th 428, 435 (*Partida*).) An objecting party "may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial. A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*Ibid.*)

"The objection requirement is necessary in criminal cases because a 'contrary rule would deprive the People of the opportunity to cure the defect at trial and would "permit the defendant to gamble on an acquittal at his trial secure in the

knowledge that a conviction would be reversed on appeal.""" (*Partida, supra,* 37 Cal.4th at p. 434.) "The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal." (*People v. Morris* (1991) 53 Cal.3d 152, 187–188, disapproved of on another ground by *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)

    While Asenuga admits he never asserted a hearsay objection to Easter's testimony at trial, he makes several hearsay arguments here against the testimony. Because the trial court never had the opportunity to rule on a hearsay objection and the People had no chance to respond accordingly to this matter at trial, it would be inappropriate to consider this issue for the first time on appeal. Thus, we conclude Asenuga forfeited his hearsay objection to Easter's testimony.

    As to Asenuga's objection based on the confrontation clause, we also conclude he forfeited this objection. "The Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, [citation], provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" (*Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 309.) "A witness's testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." (*Ibid*.) However, "[b]usiness and public records are

40

generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." (*Id*. at p. 324.)

Asenuga stated nothing to the trial court regarding his Sixth Amendment right to confrontation. Here Asenuga maintains Easter received the records from the LAPD and the objection based on accuracy was the defense's effort to confront the witness who could testify the records were in fact accurate and true. However, Asenuga made no such assertions when he objected to the testimony at trial. Asenuga contended at trial that additional external tests were needed to determine the accuracy of the phone records. Asenuga asserted, given the lack of additional external tests, even a T-Mobile representative may not be able to testify as to the phone records' accuracy. Asenuga's arguments at trial did not suggest the objection was based on his inability to confront a witness who could testify as to the accuracy of the phone records. Instead, Asenuga's contentions suggested the testimony should not be admitted because the phone records lacked foundation due to additional external tests needed to verify their accuracy. The court therefore had no fair notice that the issue it was being called upon to decide was a Confrontation Clause issue. Accordingly, we conclude it would be inappropriate to consider this objection for the first time on appeal.

**C.** *Any error in admitting Easter's testimony was harmless due to other substantial evidence of Asenuga's guilt*

Even assuming arguendo the trial court erroneously admitted Easter's testimony and Asenuga had not forfeited the objections, we conclude any error was not prejudicial because there was other substantial evidence of Asenuga's guilt. "The California Constitution states: 'No judgment shall be set aside, or new trial granted, in any cause . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.) [¶] This provision usually prohibits reversal where the challenged error did not affect the outcome of the proceedings and thus did not prejudice the appellant. (*In re Marriage of Tara & Robert D.* (2024) 99 Cal.App.5th 871, 883–884.) "Error in and of itself does not necessarily require the reversal of a judgment. Prejudice resulting from the error must be shown and that such prejudicial error under the circumstances justifies a reversal." (*Hoyt v. Los Angeles Metropolitan Transit Authority* (1962) 210 Cal.App.2d 534, 538–539.) "Prejudicial error will never be presumed, and the burden is upon the appellant to show that it exists." (*Id.* at p. 539.)

Asenuga contends Easter's testimony was significant because Davis's testimony contained inconsistencies and the phone records were argued as neutral evidence, bolstered by scientific accuracy, as to defendants' concerted activity during the incidents. But the phone records were not the only neutral evidence demonstrating defendants' concerted activity. The prosecution also presented extensive video surveillance showing

defendants' activity and location inside and outside the marijuana store, as well as at the Hilton Los Angeles Airport, during both incidents. Hence, the cell phone data were not the only neutral records of Asenuga's and the other defendants' location and activity during the incidents.

In addition, other evidence demonstrates Asenuga's guilt. Specifically Agboola made statements the crime participants coordinated to track and follow the unknown victim, as well as coordinated to follow Davis and De la Rosa to their rented house. Agboola said he and Asenuga were the first to approach the house when they arrived, and the participants were each armed with firearms during the incident. Agboola denied shooting anyone but admitted he "was fighting. Fighting."

Accordingly, the phone records were not essential to prove Asenuga's guilt because other substantial evidence linked him to the crimes. It is therefore not reasonably probable the result would have been more favorable to Asenuga had the trial court excluded Easter's testimony. Therefore, even if the court erred, it is not a ground for reversal because any such error was harmless in view of all the evidence.

## DISPOSITION

The judgment is affirmed.


CHAVEZ, J.

We concur:


LUI, P. J.                                ASHMANN-GERST, J.